# UNITED STATES DISTRICT COURT FOR
# THE WESTERN DISTRICT OF PENNSYLVANIA

NEW CASTLE SCHOOL DISTRICT,
Individually and on behalf of all others
similarly situated,

                Plaintiff

v.                                      No.

FIELDTURF USA, INC., FIELDTURF
INC., AND FIELDTURF TARKETT SAS,

                Defendants

## CLASS ACTION COMPLAINT

Plaintiff, New Castle School District, on behalf of itself and all others similarly situated,

based upon personal knowledge and all other facts based upon investigation of counsel, files this

class action complaint against FieldTurf USA, Inc, ("FieldTurf USA), FieldTurf Inc. ("FieldTurf

Inc.") and FieldTurf Tarkett SAS ("FieldTurf Tarkett") (collectively, "FieldTurf" or

"Defendants").

## I.    INTRODUCTION

1.    This case concerns FieldTurf's misrepresentations and omissions to the Plaintiff

and members of the class regarding a turf product it launched in 2005, which it advertised,

represented and warranted as long lasting and durable.  This case seeks compensation for those

who are the victims of FieldTurf's misrepresentations and unknowingly purchased the defective

turf product based on these misrepresentations.

2.    Beginning in 2005, FieldTurf began marketing an artificial grass field system,

sold under the names like "FieldTurf", "Duraspine" and "Prestige XM" (collectively, "Duraspine

Turf").  With deceptive statements, FieldTurf contracted with municipalities, school districts,

universities and athletic organizations for purchase and installation of Duraspine Turf,

installations which were often financed with taxpayer dollars. From 2005 to 2012, FieldTurf sold and installed numerous Duraspine Turf fields throughout Pennsylvania and nationwide earning over $500 million in revenue.

3. Marketed as state of the art technology FieldTurf represented its Duraspine Turf would ensure success for athletes, programs, facilities and finances. The Duraspine Turf would prevent matting, more closely mimic a natural grass playing surface, feature increased resistance to wear from usage and UV radiation, last longer with a usual life nearly twice FieldTurf's existing synthetic surface. FieldTurf represented the above as promises, guarantees and warranties.

4. In fact, these representations were misrepresentations. Rather than lasting 10 or more years, with blades of turf uniformly "standing up" like natural grass as promised and warranted, many Duraspine Turf surfaces fell over or simply crumbled to pieces. The turf rips and ends to the point that the field becomes unusable.

5. In October, 2006, FieldTurf knew that its Duraspine Turf did not perform as advertised, promised and warranted. Duraspine Turf easily frayed, causing the turf to wilt, break and shear off. In December, 2006, a FieldTurf employee wrote in an email, copying the company's CEO, that: "We are seeing fields showing splitting after under a year of play and have already had to replace one full-size field due to yarn failure after only a few months of installation!" In a November, 2007 email, the same FieldTurf employee wrote that the company's "claims made regarding the Duraspine...are ridiculous. Every day we are putting stuff out there that can't and won't live up to the marketing spin." However, the consumers and public were never told that this was "marketing spin". Rather, they rightfully believed and relied on FieldTurf's promises and warranties of future performance.

6.     FieldTurf continued its misrepresentations to potential and existing customers. For years, knowing that its Duraspine Turf products were totally defective, FieldTurf marketed and sold defective Duraspine Turf to any and every customer who would buy it, even entering into exclusive supply agreements with the manufacturer of the defective Duraspine surfaces, Mattex Leisure Industries ("Mattex") and its successor TenCate Thiolon Middle East LLC ("TenCate"), that required the ongoing sales to unsuspecting customers.

7.     As a "full-blown crisis" of "massive field failures" came to light in 2009 and 2010 (following peak sales in 2008, with 419 installations worth an estimated $168 million), FieldTurf denied any knowledge of any problems.  During the entire relevant period, and even thereafter, FieldTurf concealed Duraspine Turf's numerous defects and continued to represent that the product was durable, long lasting and superior to other turf systems.

8.     Moreover, despite longstanding knowledge of its defective products, Defendants did not notify customers or the consuming public that the product would not and was not performing as promised and warranted.

9.     The scheme was finally exposed in a December, 2016 expose by NJ Advance Media, which published findings from a lengthy, in-depth investigation into widespread failures of the Duraspine Turf in Pennsylvania and elsewhere.[1]  As part of its investigation, NJ Advance Media commissioned the University of Michigan's Breaker Space Lab to test fibers from three Duraspine fields in Pennsylvania.  The tests confirmed the strength of the turf to be well below industry standards and FieldTurf's own standards.  The investigation also concluded:

- FieldTurf knew its Duraspine Turf fields were defective.  For most of the time they sold the fields, which cost at least $300,000 to $500,000 each, executives

---

[1] *See, The 100-Yard Deception*, NJ Advance Media, http://fieldturf.nj.com/ (last visited January 5, 2017). As part of the six month investigation, NJ Advance Media filed 40 public records requests, obtained more than 5,000 pages of company records, emails, court filings and testimony, and also interviewed coaches, officials and current and former FieldTurf employees.

were aware the turf was deteriorating faster than expected and might not last a decade or more as promised.

- They misled their customers. Despite candid, internal email discussions about their overblown sales pitches, executives never changed their marketing campaign for Duraspine Turf fields.

- They tried to cover up their lies. A lawyer warned that some of those internal emails could be damaging in a lawsuit, and an executive sought to delete them. An IT consultant refused, calling it a "possible crime".

- They have and continue to keep quiet about their lies. From the time fields began to fail in 2006 until today, executives have never told most customers about Duraspine Turf's problems or how to identify signs it was prematurely falling apart.

- They stonewalled their customers who did report issues. Some customers who did report problems said FieldTurf officials slow-footed warranty claims and told them the deterioration was normal, or that their fields needed more maintenance, or the problems would get better. Further, to this day, in testimony before governmental bodies, and in publicly released statements, FieldTurf continues to publicly deny there was a widespread defect with its Duraspine Turf products.

10.     In a 2012 deposition, a marketing director testified that the representations remained unchanged, notwithstanding the mounting evidence and customer complaints, because he "wasn't asked to change them". Nevertheless, FieldTurf claims that it "has been forthcoming as possible with our customers when dealing with issues associated with Duraspine, given our evolving understanding of the issues…"[2] Nothing could be further from the truth.

## II.    PARTIES

11.     Plaintiff, New Castle School District, ("Plaintiff") is a school district in the Commonwealth of Pennsylvania. Plaintiff owns and operates a field utilized for football.

---

[2] *Statement Attributable to Eric Daliere, CEO and President of Tarkett Sports*,
https://assets.documentcloud.org/documents/3229795/FTResponsesCompilation.pdf (last visited January 5, 2017).

12.    The field has a Duraspine Turf artificial surface.   In July, 2006 Plaintiff purchased FieldTurf Duraspine Turf field.  Specifically, Plaintiff purchased FieldTurf at a cost over $800,000.00.

13.    Plaintiff has subsequently determined that the FieldTurf synthetic turf field has deteriorated and not performed as promised and warranted by Defendants.  In fact, the field did not perform as advertised, represented and warranted after a year of purchasing it.  Shortly after purchasing the product, the synthetic grass no longer was firm and was torn causing parts of the field to contain no turf and only foam.  In addition, synthetic grass was matted down and not maintaining its original form.  The performance failure and deterioration of the turf is consistent with failures that Defendant documented in its internal files.

14.    Defendant, FieldTurf USA, Inc. is a Florida corporation with its principal place of business located at 75 North Industrial Blvd., N.E. Calhoun, Georgia 30701.  FieldTurf USA marketed, manufactured, sold and installed the defective Duraspine Turf products throughout the United States.

15.    Defendant, FieldTurf, Inc. is a Canadian corporation with its principal place of business located at 8088 Montview Road, Montreal, Quebec, H4P 2L7.  Upon information and belief, FieldTurf, Inc., also manufactured and sold the defective Duraspine Turf products or otherwise conducts business in the United States, including Pennsylvania.

16.    Defendant, FieldTurf Tarkett SAS is a French corporation with its principal place of business located at 2 Rue de lEgalite, 92748 Nanterre Cedex, France.  FieldTurf Tarkett is the parent corporation to FieldTurf USA.  FieldTurf's website describes itself as a "Tarkett Company", with Tarkett describing itself as:

> [A] global leader in innovative and sustainable solutions for flooring and
> sports surfaces.  With a wide range of products including vinyl, linoleum,

carpet, rubber, wood & laminate, synthetic turf and athletics track, the Group serves customers in more than 100 countries worldwide. With 11,000 employees and 30 production sites, Tarkett sells 1.3 million square meters of flooring every day for hospitals, schools, housing, hotels, offices, stores and sports fields. Committed to sustainable development, the Group has implemented an eco-innovation strategy and promotes circular economy. Tarkett net sales of 2.5 billion euros in 2013 are balanced between Europe, North America and new economies.[3]

17.    Defendant, FieldTurf Tarkett SAS was actively involved in concealing the defect of the FieldTurf product from United States consumers.

## III.    JURISDICTION AND VENUE

18.    This Court has subject matter jurisdiction pursuant to 20 U.S.C. § 1332(d)(2), as this is a class action in which Plaintiff, a class member, is a citizen of a different state than each Defendant, the aggregate sum of class damages exceeds $5,000,000.00 and the proposed class exceeds 100 members.

19.    The Court has personal jurisdiction over FieldTurf USA, FieldTurf Inc. and FieldTurf Tarkett because each is a corporation authorized to conduct business in Pennsylvania, does business in Pennsylvania or did sufficient business in Pennsylvania, has sufficient minimum contacts with Pennsylvania or otherwise intentionally availed themselves of the Pennsylvania consumer market through the promotion, marketing and sale of defective Duraspine Turf products. This purposeful availment renders permissible the exercise of personal jurisdiction by this Court over FieldTurf and its affiliated or related entities under traditional notions of fair play and substantial justice.

20.    Venue is proper in this forum pursuant to 28 U.S.C. § 1391 because FieldTurf transacts business and may be found in this District. Venue is also proper in this District because

---

[3] http://www.fieldturf.com/en/artificial-turf/about-fieldturf.

a substantial portion of the allegations complained of herein, including Plaintiff's transaction of business with Defendants, occurred in the Western District of Pennsylvania.

## IV.    FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

### A. FieldTurf sells synthetic turf fields and, in September, 2004, entered an exclusive supply agreement for the sale and installation of Duraspine Turf fields

21.    FieldTurf markets, manufactures, sells and installs synthetic surfaces for athletic fields in Pennsylvania and the United States.  Synthetic turf is an alternative to natural grass, with expected benefits of greater durability and lower maintenance costs.  In many instances, turf fields may be used year-round in a wide range of weather conditions, and also may be utilized for extended periods of playing time without downtime for recovery between athletic contests. Synthetic turf eliminates the upkeep required for natural grass, such as weed removal, watering, fertilizing and the like.

22.    In 1988, FieldTurf introduced its first synthetic grass system for tennis courts and a synthetic grass surface used to minimize wear and tear around golf practice tees.  The company then began developing synthetic turf surfaces for other sports installations including soccer, lacrosse, football and baseball.  FieldTurf focuses on perfecting a sports field system with a sand and rubber infill, to provide superior athlete safety, high performance and extreme durability. According to FieldTurf, the infilled artificial turf industry was born when, in 1994, FieldTurf installed its first full size soccer field.[4]

23.    Although FieldTurf and Mattex's testing in 2004 and 2005 suggested Duraspine Turf was more resistant to wear than other products, some testing concluded the opposite.  In a May, 2005 email to FieldTurf's director of manufacturing, its suppliers questioned whether

---

[4] http://www.fieldturf.com/en/artifical-turf/about-fieldturf.

FieldTurf had "erred in our over exuberance in the adoption of the monofilament yarns, specifically the Mattex yarns?" Nevertheless, FieldTurf pushed Duraspine Turf to market and later entered two subsequent supply agreements with Mattex's successor, TenCate.

**B. FieldTurf marketed Duraspine Turf as durable, wear resistant and cheaper in the long run because of its greater life expectancy**

24.    In advertising Duraspine Turf to school districts, municipalities, universities and athletic organizations, FieldTurf advertised it had professional sports teams as clients. FieldTurf representatives touted Duraspine Turf as the best product on the market. Despite its expensive costs, the company lured customers with promises of lower costs in the long-run, given Duraspine Turf's greater life expectancy: the new surface, FieldTurf claimed, could be used almost continuously year-round, and would last longer than the competition despite greater use.

25.    CEO John Gilman claimed in a 2006 trade publication that, among other things, his company's "breakthrough in technology" would "change the industry", as Duraspine Turf "will double the expected useful life…"

26.    In marketing materials, FieldTurf explained that Duraspine had "unmatched 'memory' and thus resistance to matting." Rather than a "flimsy slit tape like competing systems", Duraspine would deliver "unmatched durability, especially resistance to wear. Tests indicate the Duraspine fiber is far more resistant to UV and foot traffic, the two main enemies of any turf system."

27.    In another FieldTurf flyer, FieldTurf stated that "[b]y choosing to invest in quality, safety and performance rather than basement pricing, FieldTurf has helped to ensure a successful future for your athletes, your program, your facilities and your finances… [A]lthough FieldTurf sometimes costs more to install it is actually cheaper of the long term."

28.    In a document titled "10 Reasons Why FieldTurf And Its MonoGrass System Should be Selected," FieldTurf claimed:

> FieldTurf's new "DuraSpine" MONOFILAMENT fiber offers INCREASED PRODUCT LIFE.
> ***
> …the fact remains that the new FieldTurf system will last longer.
> ***
> …added longevity will actually allow the District to amortize the life of the field on a 10+ year basis rather than the 8+ year life expectancy.

29.    Further, FieldTurf boasted about its unrivaled and rigorous quality control, its eight-year warranty (which it claimed the fields would far outlast), and the fact that "FieldTurf has nothing to hide."  Duraspine's remarkable qualities, it proclaimed, was "[n]o marketing spin."

30.    FieldTurf also told its customers, that even though its products may initially be more expensive than its competitor's products, over the long run, FieldTurf's products would potentially save the customer millions.

31.    Although FieldTurf assured customers that they likely would never need a warranty, it provided an express eight-year warranty for purchases of Duraspine Turf.  The warranty stated:

> FieldTurf USA warrants that if [Duraspine Turf] proves to be defective in material or workmanship, resulting in premature wear, during normal and ordinary use of the Product for sporting activities set out below or for any other uses for which FieldTurf gives written authorization, within 8 years from the date of completion of installation, FieldTurf will, at FieldTurf's option, either repair or replace the affected area without charge, to the extent required to meet the warranty period (but no cash refunds will be made).[5]

---

[5] *Manufacturer's Limited Warranty*, FieldTurf, available at http://media.nj.com/ledgerupdates_impact/other/2016/11/15/WWPS%Warranty.pdf (last visited January 5, 2017).

32.     These marketing efforts were successful, as sales nearly doubled within a few years.  FieldTurf benefited from Duraspine Turf's high price and profit margin, and the product's popularity led FieldTurf to hold the largest market share among synthetic turf manufactures.  In 2014, FieldTurf's V.P. of Sales and Marketing testified that, "[s]ales probably almost doubled in a few years…Very high margins, high prices and it was very successful."  The average price for a defective Duraspine Turf field was between $300,000 and $500,000, although some customers paid nearly $1 million.

**C. FieldTurf early on knew the falsity of its representations about Duraspine Turf, but continued to make false representations to customers**

33.     As early as October, 2006, FieldTurf learned that its claims, representations and warranties regarding Duraspine Turf's performance and durability conflicted with the facts and the performance of the product in the field.  Some of the earliest Duraspine Turf installations occurred in South American countries with intense UV radiation and early on a FieldTurf employee responsible for the region notified John Gilman that the fields were already showing premature wear.  In 2006, FieldTurf's operations director for Latin America emailed FieldTurf's CEO and other high ranking executives, stating, "[t]he corner kick and goal mouth areas are showing premature wear in both the small fields and the big fields."

34.     Around the same time, this employee also reported that a Chilean customer had complained that FieldTurf's first South American field, a slit-film field installed in 2003, was in better condition than the less-than-1-year-old Duraspine Turf fields.  The employee reported, "I gather that the mono fiber did not perform as expected."

35.     As a result of these disturbing reports, on or about December 28, 2006, FieldTurf's CEO Gilman wrote to van Balen at Mattex (FieldTurf's supplier): "We are seeing fields showing splitting under a year of play and have already had to replace one full-sized field

due to yarn failure after only a few months of installation!" Van Balen responded that the Duraspine material was "excellent", to which Gilman retorted: "Telling me the technology is excellent means nothing." "Now we know with heavy use, the fiber is coming apart." On New Year's Eve, 2006, Gilman again wrote to van Balen, "It's all about that old story of waiting for the next shoe to drop." John Gilman wrote. "We have had a few failures as you know. The question is...will many others fail? Who knows?"

36.    Gilman further warned Mattex that if Duraspine Turf continued to fail, FieldTurf would make a warranty claim to Mattex – which in turn might interfere with Mattex's then lucrative effort to be acquired by TenCate. Since van Balen was an owner of Mattex, he stood to gain a considerable amount of money in any acquisition. And, in fact, when Mattex was acquired, he made approximately $13 million. At the end of December, 2006, Gilman prepared a letter to van Balen, although it is not clear whether or not it was sent:

> There are currently a number of fields installed in Europe and the US that are starting to show wear and yarn splitting after less than a year in the ground, we need to have some assurance from Mattex that there is a plan and sufficient reserve in place to address any future claims for at least the next 24 months.

37.    According to FieldTurf's vice president of operation, Kevin Reynolds, by 2007 it was "very clear to us that we had a product that clearly was not living up to expectations." Reynolds "recall[ed] having discussions privately, informally, with our marketing people from an operational standpoint making the point that, 'Hey, this product really isn't doing what we claim it's going to do, and you really need to back up because it's creating a major pain in my backside.'"

38.    CEO John Gilman died in 2007, at which time David Moszkowski assumed interim CEO responsibilities. Ken Gilman, John Gilman's son and also a FieldTurf executive,

arranged a trip for Moszkowski to visit Pennsylvania to learn more about the problems with

Duraspine. Ken Gilman summarized the findings of the trip in an email. He wrote:

> [Duraspine] is nowhere near as robust or resilient as we initially though and probably will not last that much longer than a high quality slit-film yarn…In all likelihood in years 5 and 6 these Duraspine fields will be matted down and fibrillating pretty heavily…Our marketing claims and sales pitches need to reflect this reality.

Duraspine, he explained, was "beginning to deteriorate at an alarming rate" and so the

"advantages of monofilament (have) been exaggerated."

39.    Subsequently, FieldTurf's lawyer opined that the email above was discoverable

and could be used against FieldTurf in litigation, spurring Ken Gilman to ask FieldTurf's IT

consultant, in an email upon which CEO Moszkowski was copied, whether the email chain could

be permanently destroyed:

> It's our lawyer's opinion that this email thread contains information that could be used against us in a lawsuit as it is 'discoverable'…Can we somehow get it zapped off?

40.    The IT consultant responded and said it was not likely the email could be wiped

from FieldTurf's systems, because too many copies were likely made. In addition, he stated

"[l]egally, it is not possible…You would be asking me…to commit a possible crime."

41.    Ken Gilman continued to persist in pressing Moszkowski and his successors into

revising FieldTurf's marketing claims:

> As you know our sales and marketing guys continually make claims that we can't possibly meet in the real world. This opens us up to tons of exposure from a legal standpoint
>                                ***
> On the marketing side the claims made regarding the Duraspine…fiber are ridiculous. Everyday we are putting stuff out there that can't and won't live up to the marketing spin. We have to control this somehow!!!

42.    Despite this knowledge concerning the problems experienced with Duraspine Turf, FieldTurf installed 317 Duraspine Turf fields in 2007, worth at least $127 million.

43.    In a February, 2008 email to Moszkowski, Ken Gilman wrote that "Duraspine is not all that it's cracked up to be especially in terms of wear resistance." When FieldTurf named Joe Fields as CEO in March, 2008, on the same day Fields started as CEO, Ken Gilman again told FieldTurf upper management about the numerous problems with Duraspine Turf: "Irresponsible sales and marketing claims are made continuously that the product simply cannot possibly technically deliver on." He opined that the false representations "set[ ] us up for future claims, unhappy customers, lawsuits, etc."

44.    In response, Fields signed another exclusive supply agreement for Duraspine with TenCate in or around July, 2008. That year, Duraspine Turf sales peaked with 419 installations in the United States worth at least $168 million.

45.    According to Court records, in or around September, 2008, Ken Gilman, former CEO Moszkowski and FieldTurf's Vice President of Operations were terminated.

**D.  As customer complaints about Duraspine mounted in 2009 and 2010, FieldTurf denied its knowledge about the problem**

46.    In 2009 and 2010, FieldTurf received an "alarming number of complaints from customers" who purchased Duraspine Turf. They uniformly "complained that the fiber on their field[s] is fading, splitting, thinning and ultimately disintegrating within two to three years of installation."[6]

47.    In response to these complaints and accompanying warranty claims, FieldTurf repeatedly refused to honor the terms of its expressed written warranty. For example, when the

---

[6] *Summary of Results of Investigation Into Causes of Fiber Failure,* available at http://media.nj.com/ledgerupdates_impact/other/2016/11/15/FT%20Internal%20Investigation.pdf (last visited January 5, 2017).

Palisades School District in suburban Philadelphia, Pennsylvania complained of defective Duraspine Turf in 2012, FieldTurf offered an upgrade to an entirely new product – at a cost to the school district of $410,611.00. When school officials balked, FieldTurf offered a replacement for $325,000.00 – in direct conflict with the express warranty's promise of a no-cost repair.

48.     Likewise, when the Collinsville, Oklahoma School District sought a replacement for its defective Duraspine Turf, FieldTurf offered to replace it for around $250,000.00, again in violation of the warranty.

49.     As customers complained and FieldTurf simultaneously experienced a decline in sales, FieldTurf replaced Fields with a new CEO, Erick Daliere in September, 2009. Later, in early 2010, FieldTurf commenced an internal investigation into Duraspine Turf's problems. The results of the investigation were chronicled in a December, 2010 internal report. The report noted that the investigation was commenced due to an "alarming" number of complaints concerning the Duraspine Turf products. The report posited that the primary cause of Duraspine Turf failures was that its product contained inadequate protection from ultraviolet light and heat. Following the investigation, CEO Daliere said in a statement that FieldTurf was "surprised" to learn that Duraspine Turf inadequately withstood UV radiation in light of assurances from Mattex/TenCate and their own initial testing. Only then, FieldTurf claimed, did it first become aware of Duraspine Turf's shortcomings. The earlier discussions, it explained, did not make clear that UV radiation was the cause.

50.     In November, 2010, FieldTurf informed TenCate it intended to pursue claims over the defective Duraspine Turf and sought settlement negotiations. TenCate responded that FieldTurf had breached the supply agreement by developing a new competing product and,

consequently, TenCate would end FieldTurf's access to Duraspine on March 2, 2011, rather than on December 11, 2011 (the expiration date of the latest supply agreement).

51.    On March 1, 2011, FieldTurf filed a lawsuit against TenCate.  FieldTurf alleged claims for fraudulent inducement of contract and breach of warranties, and claimed that sometime after FieldTurf and TenCate entered into the supply agreement in 2005, TenCate altered the turf's formula by replacing quality ingredients with cheaper alternatives.  In its lawsuit, FieldTurf admitted that it had built more than 100 fields using defective fibers that are prematurely degrading.  TenCate claimed that the failures owed to FieldTurf's poor installations, and it supported its position by pointing out that FieldTurf continued to sell Duraspine Turf, including 307 fields in 2009, 164 in 2010, 28 in 2011 and one in 2012.  When FieldTurf claimed that it had knowledge of the product's alleged defects, TenCate and FieldTurf settled in 2014 for an undisclosed sum, but believed to be in the tens of millions.  However, FieldTurf failed to inform its customers, including Plaintiff herein, of its knowledge that it had installed defective fibers in Plaintiff's artificial turf field.  Instead, FieldTurf kept Plaintiff and the rest of its customers in the dark and having to deal with replacing the failing fields on their own.

52.    Plaintiff relied upon Defendant's above representations regarding quality of FieldTurf when purchasing it.

## V.    CLASS ALLEGATIONS

53.    Plaintiff brings this action against FieldTurf on behalf of itself and as a class action, pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3), on behalf of the following classes:

### Class I

All persons in the United States and its territories who purchased Duraspine Turf from FieldTurf or its affiliates, entities or subsidiaries.

Excluded from the Class are FieldTurf or their affiliates, subsidiaries, agents, board members, directors, officers and/or employees. Also excluded from the Class are authorized Duraspine Turf installers.

### Class II

All persons in the Pennsylvania who purchased Duraspine Turf from FieldTurf or its affiliates, entities or subsidiaries. Excluded from the Class are FieldTurf or their affiliates, subsidiaries, agents, board members, directors, officers and/or employees. Also excluded from the Class are authorized Duraspine Turf installers.

54.    Plaintiff reserves the right to modify or amend the definition of the proposed class before the Court determines whether certification is appropriate.

55.    The proposed class is so numerous that the case would be impracticable under the circumstances. While the exact number of members of the class is unknown to Plaintiff, it is upon information and belief that the class consists of hundreds of entities.

56.    The individual class members are ascertainable, as the names and addresses of all class members can be identified in FieldTurf's business records.

57.    Numerous questions of law or fact arise from FieldTurf's conduct that are common to the Class, including but not limited to:

a.  Whether Duraspine Turf is defective under normal use and within expected useful lifespan, as advertised, represented and warranted by FieldTurf;
b.  Whether and when FieldTurf had knowledge of the defects in Duraspine Turf;
c.  Whether FieldTurf concealed defects in Duraspine Turf;
d.  Whether FieldTurf had a duty to disclose material facts to Plaintiff and the Class regarding defects in the Duraspine Turf;
e.  Whether FieldTurf's omissions regarding the Duraspine Turf were likely to deceive Plaintiff and Class;
f.  Whether FieldTurf's alleged conduct constitutes the "use or employment by an person of any unconscionable commercial practice, deception, fraud, false pretense, false promise and misrepresentation…in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby" within the meaning of the

Pennsylvania Consumer Fraud Act and other applicable state consumer fraud statutes;

g.  Whether further, or in the alternative, FieldTurf has been unjustly enriched under Pennsylvania or other applicable state laws;

h.  Whether FieldTurf has violated its express warranties with Plaintiff and the Class;

i.  Whether FieldTurf has violated implied warranty of merchantability under Pennsylvania or otherwise applicable state law;

j.  Whether FieldTurf actively concealed the Duraspine Turf defect in order to maximize profits to the detriment of Plaintiff and the Class;

k.  Whether Plaintiff and the Class members are entitled to damages, restitution, disgorgement, equitable relief or other relief;

l.  The amount and nature of such relief to be awarded to Plaintiff and the Class; and

m.  Whether FieldTurf's concealment of defects in the Duraspine Turf toll applicable statutes of limitations, if any.

These and other questions are common to the Class and predominate over any questions affecting only individual class members.

58.    Plaintiff's claims are typical of the Class in that Plaintiff received and relied upon the same misrepresentations and warranties from FieldTurf and was subject to the same omissions of material fact as all other class members.  Plaintiff and all class members were damaged by the same wrongful conduct of FieldTurf, and the relief sough is common to the Class.

59.    Plaintiff will fairly and adequately represent the interests of the Class in that it has no conflict with any other members of the Class.  Furthermore, Plaintiff has retained competent counsel experienced in class action and other complex commercial litigation.

60.    FieldTurf has acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

61.    This class action is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy.  Prosecution as a class action will eliminate the possibility of

repetitive litigation.  There will be no material difficulty in the management of this action as a class action.

62.    The prosecution of separate actions by individual class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for FieldTurf.

## VI.    TOLLING OF STATUTE OF LIMITATIONS

### A. Discovery Rule Tolling

63.    Plaintiff and Class members had no way of knowing about the defects in Duraspine Turf and other information concealed by FieldTurf.  FieldTurf systematically lied to Plaintiff and Class members concerning the qualities of Duraspine Turf.  When problems were discovered, FieldTurf claimed there was no defect, and provided other reasons for the rapid deterioration in FieldTurf's products, like poor maintenance.  In addition, FieldTurf advised Plaintiff and Class members that over time, the problems they were experiencing would diminish.

64.    Further, FieldTurf has repeatedly and consistently misled Plaintiff and the Class by engaging in extensive misdirection towards the Plaintiff and the class.  FieldTurf repeatedly represented that to the extent any customers had experienced more rapid deterioration in their field than promised, the problem related only to those customers in "high UV" areas. FieldTurf's CEO, Eric Daliere, specifically said that Pennsylvania was not a "high UV" area, therefore suggesting that Duraspine Turf fields in Pennsylvania were not subject to any known defects.

65.    In addition, internally FieldTurf acknowledged that the Duraspine Turf defect may not manifest itself until several years after installation, but well before the expiration of the

warranty period. For example, in an internal email, a FieldTurf executive: "[Duraspine] is nowhere near as robust or resilient as we initially thought and probably will not last that much longer than a high quality slit-film yarn…In all likelihood *in years 5 and 6* these Duraspine fields will be matted down and fibrillating pretty heavily…Our marketing claims and sales pitches need to reflect this reality." (Emphasis added).

66.     Within the period of any applicable statutes of limitation, Plaintiff and the other Class members could not have discovered through the exercise of reasonable diligence that FieldTurf was concealing defects in its Duraspine Turf products.

67.     Plaintiff and the other Class members did not discover, and did not know of facts that would have caused a reasonable person to suspect, that FieldTurf knew that its products were defective, nor would a reasonable and diligent investigation have disclosed that FieldTurf had information in its possession about the existence of defects and that FieldTurf opted to conceal, and still conceals, information about the defect. It was not until December, 2016 when a detailed expose was published on FieldTurf which provided an accounting of FieldTurf's deceit.

68.     All applicable statues of limitations have been tolled by operation of the discovery rule.

**B.  Fraudulent Concealment Tolling**

69.     All applicable statutes of limitations have also been tolled by FieldTurf's knowing and active fraudulent concealment and denial of the facts alleged herein throughout the period relevant to this action and through today.

70.    Instead of disclosing the defects in its products of which it was aware, FieldTurf falsely represented, among other things, that its Duraspine Turf products were the most durable on the market, and would last far longer than their warranty.

**C. Estoppel**

71.    FieldTurf was under a continuous duty to disclose to Plaintiff and the other Class members the true character, quality and nature of the many defects plaguing its Duraspine Turf products.

72.    FieldTurf knowingly, affirmatively and actively concealed the true nature, quality and character of the problems in its Duraspine Turf products from its customers.  Further, FieldTurf often offered a myriad of other causes, which were lies, for its customer's problems with their Duraspine Turf.  FieldTurf also advised its customers that the issues they were experiencing would diminish over time.  These were also lies.

73.    Based on the foregoing, FieldTurf is estopped from relying on any statutes of limitations in defense of this action.

**COUNT I**
**FRAUDULENT CONCEALMENT UNDER PENNSYLVANIA LAW**

74.    Plaintiff incorporates by reference all of the above allegations as if fully set forth herein.

75.    FieldTurf intentionally concealed that its Duraspine Turf products were highly defective or acted with reckless disregard for the truth and denied Plaintiff and the other Class members information that is highly relevant to their purchasing decision.

76.    FieldTurf further affirmatively misrepresented to Plaintiff in advertising and other forms of communication, including standard and uniform material provided to Plaintiff and other Class members, that the Duraspine Turf products that it was selling had no defects, were

substantially more durable than any other product on the market or even its own products and would perform properly, were fit and suitable for its intended purpose as an athletic sports field or turf.

77.     FieldTurf knew these representations were false when made.

78.     The Duraspine Turf products purchased by Plaintiff and the other Class members were, in fact, defective, and deteriorated much faster than represented, warranted and promised under normal conditions.

79.     FieldTurf had a duty to disclose that its Duraspine Turf products suffer from numerous defects, because Plaintiff and the other Class members relied on FieldTurf's material representations that Duraspine Turf products were far superior to any other artificial turf surface in existence and will perform and last as represented, promised and warranted.

80.     The aforementioned representations were material because they were facts that would typically be relied on by a person or entity purchasing an artificial turf surface.  FieldTurf knew or recklessly disregarded that its representations were false because it had actual knowledge that its Duraspine Turf products suffered from numerous and significant defects which they knew would cause the Duraspine Turf products to fall well short of FieldTurf's representations and warranties concerning Duraspine Turf products.

81.     Plaintiff and the other Class members relied on FieldTurf's representations and reputation - along with their failure to disclose the defective nature of the Duraspine Turf products - in purchasing their Duraspine Turf product.

82.     As a result of their reliance, Plaintiff and the other Class members have been injured in an amount to be proven at trial, including but not limited to, their lost benefit of the bargain and overpayment for their Duraspine Turf product.

83.     FieldTurf's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiff and other Class members.  Plaintiff and the other Class members are therefore entitled to an award of punitive damages.

## COUNT II
## BREACH OF EXPRESS WARRANTY UNDER PENNSYLVANIA LAW

84.     Plaintiff incorporates by reference all the above allegations as if fully set forth herein.

85.     When FieldTurf's Duraspine Turf prematurely deteriorated before the expiration of its eight-year warranty, many members of the Class contacted FieldTurf with warranty claims.

86.     FieldTurf repeatedly responded by denying the claims, delaying the processing of those claims until the warranty expired, or offering customers repair or replacement at substantial cost.

87.     FieldTurf's express warranty with Plaintiff and the Class required it to repair or replace defective Duraspine Turf at no cost within the eight-year warranty period.  Under Pennsylvania law, FieldTurf's various oral and written representations regarding Duraspine Turf's performance, also constituted an express warranty of future performance, longevity and durability to its customers.

88.     FieldTurf's response to warranty claims, including denials, delayed processing, and offers for repair or upgrade only at cost to the Class, is in breach of FieldTurf's express warranty(s) to Plaintiff and the Class.

89.     Under Pennsylvania law, Plaintiff and the Class are entitled to recover damages for the FieldTurf's breach of express warranty(s) in the amount of the difference between the

defective Duraspine Turf, as delivered, and the product's value as it was warranted and/or the amount it paid or will cost to purchase and replace the FieldTurf.

90.    Accordingly, on behalf of itself and the Class, Plaintiff seeks to recover damages in an exact amount to be determined at trial, and all other damages and remedies, including consequential and incidental damages, as permitted by Pennsylvania law.

**COUNT III**
**BREACH OF IMPLIED WARRANTY OF**
**MERCHANTABILITY UNDER PENNSYLVANIA LAW**

91.    Plaintiff incorporates by reference all of the above allegations as if fully set forth herein.

92.    Plaintiff's purchase of Duraspine Turf is governed by Pennsylvania law.

93.    Under Pennsylvania law, a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. To be merchantable, a good must be fit for the ordinary purposes for which such goods are used.

94.    Pursuant to 13 Pa. Cons. Stat. Ann. § 2314, by placing their product into the stream of commerce, Defendants impliedly warranted that their FieldTurf Product was merchantable, fit for its intended purpose and suitable for use as an artificial turf sports field.

95.    Further, at the time of installing the turf field at Plaintiff's field, FieldTurf had reason to know that its Duraspine product would be used as a football field at the Plaintiff's field and that the Plaintiff was relying upon FieldTurf's skill and judgment to furnish suitable products for this particular purpose.  Pursuant to 13 Pa. Cons. Stat. Ann. § 2314, FieldTurf impliedly warranted that its FieldTurf Product was fit for this particular purpose.

96.    FieldTurf's Product is not merchantable.  In breach of the implied warranties of

merchantability and fitness for a particular purpose, the artificial turf field is defective because it

physically and chemically degraded prematurely during its 10+ year useful life.

97.    The artificial turf field was defective when it was sold and installed by

Defendants.

98.    The defects in the artificial turf were not open and/or obvious to Plaintiff at the

time the field was installed by FieldTurf.

99.    Any purported disclaimer or limitation of the duration and scope of the implied

warranty of merchantability given by Defendants is ineffective, not conspicuous, unreasonable,

unconscionable and void, because Defendants knew or recklessly disregarded that the defects in

its artificial turf fields existed and might not be discovered, if at all, until the field had been used

for a period of time, and Defendants willfully withheld information about the defects from

Plaintiff.

100.    The purported warranty's limitations are both procedurally and substantively

unconscionable.  FieldTurf knew or should have known that the field it installed at Plaintiff's

field were defective in that it was susceptible to premature failure.  Additionally, FieldTurf had

unequal bargaining power, misrepresented the field's quality and durability, and the limited

remedies in the warranty unreasonably favor FieldTurf and fail Plaintiff's and class members'

reasonable expectations for the field's useful life.

101.    Defendants knew that its product was defective based upon the internal emails

and correspondence to its supplier alleged above, and its own product testing.

102.    As a direct and proximate result of Defendants' breach of its implied warranties,

Plaintiff has been damaged in, inter alia, in the amount of the difference between the defective

Duraspone Turf as delivered and the product's value as warranted and/or the amount it paid to purchase and replace Defendants' un-merchantable artificial turf field.

## COUNT IV
## COMMON LAW FRAUD UNDER PENNSYLVANIA LAW

103.    Plaintiff incorporates by reference all of the above allegations as if fully set forth herein.

104.    FieldTurf made numerous material misrepresentations to Plaintiff and Class members, concerning the performance of its "revolutionary" Duraspine Turf products.  In addition, FieldTurf failed to disclose numerous material facts concerning the failure rate of its Duraspine Turf products, and, that FieldTurf knew that its Duraspine Turf products would not perform as intended.

105.    The representations made by Defendant were false.  At the time they were made, FieldTurf knew they were false.

106.    FieldTurf knew its various representations about its Duraspine Turf products were false, but made them in an effort to induce Plaintiff and other Class members to purchase its Duraspine Turf products at a premium price.

107.    At the time FieldTurf made these misrepresentations, Plaintiff and other Class members were ignorant of the falsity of FieldTurf's representations and believed them to be true. In reliance on these representations, Plaintiff and other Class members were induced to and did purchase a Duraspine Turf product.  Had Plaintiff known the actual facts, Plaintiff and other Class members would not have purchased Duraspine Turf products, or, would not have paid as much for their Duraspine Turf products.

108.    As a direct and proximate result of FieldTurf's fraud, Plaintiff and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all

compensatory damages, incidental and consequential damages and other damages allowed by law.

**COUNT V**
**BREACH OF CONTRACT UNDER PENNSYLVANIA LAW**

109.    Plaintiff incorporates by reference all the above allegations as if fully set forth herein.

110.    Each and every sale of a Duraspine Turf product constitutes a contract between FieldTurf and the purchaser.  FieldTurf breached these contracts by, among other things, selling to Plaintiff and the other Class members, defective Duraspine Turf products and by misrepresenting or failing to disclose that Duraspine Turf products were defective, and were not durable.

111.    FieldTurf's misrepresentations and omissions alleged herein, including but not limited to its failure to disclose that its Duraspine Turf products were actually defective and were not durable, caused Plaintiff and other Class members to make their purchases of their Duraspine Turf products.  Absent those misrepresentations and omissions, Plaintiff and the other Class members would not have purchased Duraspine Turf products, would not have purchased Duraspine Turf products at the price they paid.  Accordingly, Plaintiff and the other Class members overpaid for their Duraspine Turf products and did not receive the benefit of their bargain.

112.    As a direct and proximate result of FieldTurf's breach of contract, Plaintiff and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages and other damages allowed by law.

## COUNT VI
## UNJUST ENRICHMENT UNDER PENNSYLVANIA LAW

113. Plaintiff incorporates by reference all the above allegations as if fully set forth herein.

114. FieldTurf received at least $570 million in revenue from the sale of over 1,400 defective Duraspine Turf fields between 2005 and 2012.

115. This $570 million in revenue was a benefit conferred upon FieldTurf by Plaintiff and the Class, which includes municipalities, school districts, universities and athletic organizations in Pennsylvania and across the United States.

116. FieldTurf manufactured, marketed, sold and installed defective and warranted Duraspine Turf fields to Plaintiff and the Class while actively concealing its known defects, including premature and early deterioration, all while claiming the Duraspine Turf was cost effective and promised a ten-plus year lifespan.

117. Under Pennsylvania law, a defendant must return a benefit conferred by a plaintiff when retention of that benefit would be unjust without remuneration by the defendant.

118. FieldTurf was unjustly enriched through financial benefits conferred upon it by Plaintiff and the Class, in the form of $570 million in revenue.

119. Plaintiff and the Class elected to purchase and install Duraspine Turf fields based upon FieldTurf's misrepresentations, deception and omissions. FieldTurf knew and understood that it would and did receive a financial benefit, and voluntarily accepted the same, from Plaintiff and the Class when they elected to purchase and install Duraspine Turf.

120. By selecting FieldTurf's Duraspine and purchasing it at a premium price, Plaintiff and the Class expected that the Duraspine Turf would have the lifespan and performance promised by FieldTurf and would not deteriorate within a few years of installation. The reduced

lifespan of Duraspine Turf and premature deterioration within a few years of installation unjustly enriched FieldTurf beyond its legal rights by securing through deceit and falsehoods $570 million in revenues between 2005 and 2012.

121.     Therefore, because FieldTurf will be unjustly enriched if it is allowed to retain the revenues obtained through falsehoods, deception and misrepresentations, Plaintiff and each class member is entitled to recover the amount by which FieldTurf was unjustly enriched at his or her expense.

122.     Accordingly, Plaintiff, on behalf of itself and all similarly situated, seeks damages against FieldTurf in the amounts by which FieldTurf has been unjustly enriched at Plaintiff's and the Class' expense and such other relief as this Court deems just and proper.

## COUNT VII
## CONSUMER PROTECTION ACT

123.     Plaintiff repeats and re-alleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

124.     The acts, omissions and practices of FieldTurf as alleged herein constituted and continue to constitute, unlawful and unfair business acts and practices within the meaning of Section 201 et seq. of the Pennsylvania Unfair Trade Practices and Consumer Protection law. Plaintiff has standing to bring this action under Unfair Trade Practices and Consumer Protection Law § 201 because it has suffered an injury-in-fact and lost money because of Defendants' conduct.

125.     FieldTurf has engaged in "unlawful" business acts and practices by their violation of the statutes and regulations referenced above, including, but not limited to: Pennsylvania Unfair Trade Practices and Consumer Protection Law § 201; and Pennsylvania common law that prohibits fraudulent concealment and breaches of implied warranty.

126.    FieldTurf has also engaged in "unfair" business acts or practices in that the harm caused by Defendants' manufacture, supply, installation and or control of its product outweighs the utility of such conduct, and the conduct offends public policy, is immoral, unscrupulous, unethical, deceitful and offensive, caused substantial injury to Plaintiff and similar consumers and provides Defendants with an unfair competitive advantage over those companies that abide by the law.

127.    FieldTurf's actions described herein constitute fraud within the meaning of Pennsylvania Unfair Trade Practices and Consumer Protection Law § 201 et seq, in that Defendants have failed to disclose that their products contain the defects set forth in the internal emails and correspondence, and as admitted in the TenCate Action. FieldTurf's failure to disclose these defects was likely to mislead Plaintiff and similar consumers into believing that the products were free from defects and safe to use. Plaintiff relied on FieldTurf's claims and warranties that expected useful life of the Duraspine field was 10+ years and that the Duraspine turf product had durability and longevity which was superior to its competitors' turf products.

128.    As a result of the conduct described above, FieldTurf has been and will be unjustly enriched at the expense of Plaintiff and similar entities.

129.    The aforementioned unlawful or unfair business acts or practices conducted by FieldTurf has been committed in the past and continue to this day. FieldTurf has failed to acknowledge the wrongful nature of their actions. FieldTurf has not corrected or publicly issued individual and comprehensive notices to Plaintiff and other users of their products or provided full restitution and disgorgement of all ill-gotten monies either acquired or retained by FieldTurf as a result thereof, thereby depriving Plaintiff and other users of FieldTurf's products of artificial turf that is not merchantable or fit for its intended use.

130.    Pursuant to Pennsylvania Unfair Trade Practices and Consumer Protection Law §
201-4.1, Plaintiff seeks an order of this Court requiring FieldTurf to disgorge all ill-gotten gains
and awarding Plaintiff full restitution of all monies wrongfully acquired by Defendants by means
of such "unlawful" and "unfair" conduct, so as to restore any and all monies to Plaintiff which
were acquired and obtained by means of such "unlawful" and "unfair" conduct, and which ill-
gotten gains are still retained by FieldTurf.  Plaintiff additionally requests that such funds be
impounded by the Court or that an asset freeze or constructive trust be imposed upon such
monies by FieldTurf.  Plaintiff and other users of FieldTurf's products may be irreparably
harmed and/or denied an effective and complete remedy if such an order is not granted.

## COUNT VIII
## DECLARATORY RELIEF

131.    Plaintiff repeats and re-alleges each and every allegation contained in the
preceding paragraphs as if fully set forth herein.

132.    An actual controversy has arisen and now exists between Plaintiff and Defendants
concerning their respective rights and duties with regard to Defendants' artificial turf supplied
and installed at the New Castle School District.

133.    A judicial declaration is necessary and appropriate at this time under the
circumstances in order that the parties may ascertain their rights and duties herein.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the Class request that the Court enter an order or judgment
against FieldTurf including the following:

A.    Declaring that this action may be maintained as a class action pursuant to Federal
        Rules of Civil Procedure 23 and an order certifying this case as a class action and
        appointing Plaintiff as class representative;

B.  Finding that FieldTurf has violated its express warranties to Plaintiff and the Class and awarding on that basis all damages and remedies permitted by Pennsylvania law;

C.  Finding that FieldTurf has violated its implied warranty of merchantability to Plaintiff and the Class and awarding on that basis all damages and remedies permitted by Pennsylvania law;

D.  Finding that FieldTurf has been unjustly enriched under Pennsylvania law, that Plaintiff and the Class have been injured as a result of FieldTurf's conduct and that FieldTurf must refund all unjustly retained benefits to Plaintiff and the Class;

E.  Whether FieldTurf's conduct warrants punitive damages;

F.  Defendants marketed FieldTurf in violation of the Pennsylvania Consumer Protection Act.

G.  Awarding Plaintiff and the Class costs and disbursements and reasonable allowances for the fees of Plaintiff's and the Class' counsel and experts and reimbursement of expenses;

H.  Awarding such other and further relief the Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiff and the Class hereby demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

LEVIN, SEDRAN & BERMAN

Date:   November 30, 2017

Daniel C. Levin, Esquire
Charles E. Schaffer, Esquire
510 Walnut Street, Ste. 500
Philadelphia, Pa 19106
215-592-1500

*Attorneys for Plaintiff and the Class*